[No. S057133. July 9, 1998.]

EDA ARTIGLIO et al., Plaintiffs and Appellants, v.
CORNING INCORPORATED et al., Defendants and Respondents.

## COUNSEL

Robins, Kaplan, Miller & Ciresi, Alexandra M. Day, Bruce A. Finzen, Robinson, Phillips & Calcagnie, Joseph L. Dunn, Thorsnes, Bartolotta, McGuire & Padilla and B. James Pantone for Plaintiffs and Appellants.

McInnis, Fitzgerald, Rees & Sharkey, Luce, Forward, Hamilton & Scripps, Cary W. Miller, Richard R. Spirra, Baker & Hostetler, Peter W. James, Angela C. Agrusa, Nixon, Hargrave, Devans & Doyle, William D. Eggers, David H. Tennant, Mayer, Brown & Platt, Herbert L. Zarov, Michele L. Odorizzi, Daniel J. Delaney, Morris, Polich & Purdy, Anthony G. Brazil, Steven M. Crane, Lee A. Miller, Douglas J. Collodel, Janet M. Richardson and Gerald P. Schneeweis for Defendants and Respondents.

Daniel J. Popeo, Paul D. Kamenar, Susan W. Liebeler, Fred Main, Carrie-Lee Coke, Hugh F. Young, Jr., Harvey M. Grossman, Armstrong, Teasdale, Schlafly & Davis, Jordan B. Cherrick, Jeffrey T. McPherson, Thelen, Marrin, Johnson & Bridges, Curtis A. Cole, McKenna & Cuneo, Daniel G. Jarcho, Larry R. Pilot, Michael H. Hinckle and Stanley W. Landfair as Amici Curiae on behalf of Defendants and Respondents.

## OPINION

**WERDEGAR, J.**—In this case we discuss the circumstances under which those who undertake to provide manufacturers of medical products with human toxicology research and fail to exercise reasonable care in performing that undertaking may face potential tort liability pursuant to the "negligent undertaking" theory articulated in Restatement Second of Torts section 324A (section 324A).

As will be seen, California courts, including this court, have long recognized section 324A's negligent undertaking theory, the general viability of

which is not at issue. We have limited our review in this matter to whether the trial court erred in granting summary judgment on plaintiffs' section 324A claims, which are based on allegations the defendant corporations negligently discharged an undertaking to provide silicone toxicology research to their subsidiary, a manufacturer, inter alia, of medical devices.

We conclude that, as a matter of law, based on the record before the trial court on summary judgment, when defendant The Dow Chemical Company (Dow Chemical)[1] conducted and reported silicone toxicology research for Dow Corning Corporation (Dow Corning), any risk of physical harm to plaintiffs from negligent performance of that undertaking was unforeseeable. Accordingly, we affirm the judgment of the Court of Appeal upholding the trial court's grant of summary judgment.

### Background[2]

Dow Corning was incorporated under the laws of Michigan in 1943. Dow Chemical and Corning each contributed to Dow Corning technology and licenses under patents they held in the field of organosilicon compounds and each received 50 percent of Dow Corning's stock. Dow Chemical provided Dow Corning physical facilities in which Dow Corning performed tests on silicone products. In addition, Dow Chemical rendered certain services to Dow Corning.

Scientists working for Dow Chemical (V.K. Rowe, H.C. Spencer and S.L. Bass) published an article in 1948 stating they had conducted toxicological research on various silicones. Rowe, Spencer and Bass stated they had found that, as a group, silicones have a very low order of toxicity. The article also warned that silicone compounds had certain potential hazards. Specifically, the Dow Chemical scientists stated that some types of silicones caused irritation, inflammation, edema and necrosis, that vapors of volatile silicones caused death in a saturated atmosphere, and that exposure to low vapor concentrations slowed growth in guinea pigs and slightly increased the weight of guinea pig livers and kidneys. The Dow Chemical scientists' article also related that high dosages of some silicone compounds caused spleen enlargement and that most tested silicone compounds caused eye irritation.

Dow Chemical and Dow Corning each performed further toxicological tests on silicone. In 1954, Dow Chemical and Dow Corning jointly commissioned a study of the toxicity of a silica dust Dow Corning was producing.

---

[1]We previously granted plaintiffs' and defendants' joint request that review as to defendant Corning Incorporated (Corning), only, be dismissed as improvidently granted.

[2]Our factual recitation parallels (and occasionally supplements) that of the Court of Appeal. No party petitioned for rehearing to suggest the Court of Appeal omitted or misstated any material fact. (Cal. Rules of Court, rule 29(b)(2).)

This dust proved useful for coating certain types of paper and had potential applications in the pharmaceutical, cosmetic, paint, varnish, ink, rubber, plastic and adhesive industries. Saranac Lake Laboratories of New York performed the study. Published in 1957, the study concluded, generally, that exposing rats to high levels of silica dust severely damaged their breathing apparatus.

In 1956, M. B. Chenoweth of Dow Chemical's biochemistry department participated with Dow Corning scientists in conducting a study on the migration of silicone compounds when introduced into the bodies of mammals. The study found that a silicone compound later used in breast implants migrated throughout dogs when administered orally and throughout a rat when injected intramuscularly. A follow-up report distributed to both Dow Chemical and Dow Corning indicated that, when absorbed through the skin, small amounts of the same silicone compound reached a rabbit's adrenal glands and kidneys. That same year, Dow Corning commissioned Dow Chemical to study whether silicone fluids can be tolerated when injected intravenously and, if so, in what amount. A Dow Corning researcher advised his Dow Chemical counterpart that "[t]he immediate utility of the answer is not too apparent, but the question has been asked repeatedly and we would like to be in a position to reply with some knowledge." Dow Chemical and Dow Corning cooperated with and funded certain silicone toxicology research conducted by the University of Miami in 1957. One project involved feeding rats six different silicone compounds. In a letter to Dow Corning (with a copy to a Dow Chemical scientist), the University of Miami stated its experimental results were "negative, or in other words, the feeding of the six Dow-Corning silicones resulted in no harmful or deleterious effects with the following exceptions[:] [¶] (a) All six compounds depressed the granulocytic elements of the peripheral (tail) blood of the female rats. (The males were not affected.) [¶] (b) The livers of rats fed compound 2-4141 were significantly heavier than the livers of the control rats. [¶] (c) The livers of rats fed compound 2-4141 demonstrated fatty infiltration or degeneration."

Liver samples from the rats fed compound 2-4141 were submitted for further analysis to Dow Chemical's biochemical research department. These samples showed some changes in fat composition, and Dow Chemical researchers observed "possibly these globules represent silicone rather than fat." As Dow Chemical concedes, its researchers' follow-up observations were not included in the printed report on the University of Miami study that was sent to Dow Corning.

In 1959, Dow Chemical performed an experimental study for Dow Corning that demonstrated silicones may cause eye irritation. The study's author

speculated that such irritation was not caused by chemical reaction to the silicone being tested, but by silicone's tendency to reduce the surface tension of the eyeball.

Responding to inquiries from the medical community about medical application of silicones, Dow Corning in 1959 established a Center for Aid to Medical Research. In 1961, T. D. Cronin, a plastic surgeon from Texas, contacted Dow Corning to discuss using silicones for breast implants. Dow Corning eventually employed Cronin and, in 1962, clinical trials on Dow Corning silicone breast implants commenced.

In 1964, Dow Corning formed a medical products division to market breast implants and other medical devices using silicone technology. Plaintiffs "do not dispute that Dow [Chemical] has never made or sold any silicone gel breast implants."[3] Although after beginning to market breast implants Dow Corning apparently continued to receive some silicone toxicology research from Dow Chemical, Dow Corning's medical products division had its own staff of chemists and toxicity experts. Dow Corning's medical products division has worked with more than 35,000 doctors from all over the world and has developed an extensive medical library.

In 1975, Dow Chemical, Corning and Dow Corning entered into trademark agreements. These agreements recited, inter alia, that Dow Chemical and Corning "have controlled [Dow Corning's] operations, including the quality of its goods and services." Dow Chemical granted Dow Corning the right to use its tradename and trademark; in return Dow Chemical retained the right to inspect Dow Corning's manufacturing processes to assure the quality of its products and to approve or disapprove any products manufactured, distributed or sold under the Dow Chemical trademark.

To date, Dow Corning has developed more than 4,500 different silicone products, including the silicone gel breast implants that are the subject of this litigation.

When in 1964 Dow Corning first began marketing breast implants, the Food and Drug Administration (FDA) did not regulate medical devices. In

---

[3]The quotation is from plaintiffs' "Separate Statement of Disputed Facts," dated March 16, 1994, and submitted to the trial court in opposition to Dow Chemical's motion for summary judgment. Plaintiffs now assert "Dow Chemical marketed and sold Dow Corning breast implants in Europe, Central and South America, and Australia through its majority owned (and later wholly owned subsidiary) LePetite," citing asserted "new evidence" outside the record. Prior to oral argument in this matter, we denied both plaintiffs' "Motion to Allow the Production of Additional Evidence on Appeal and Request for Judicial Notice" and Dow Chemical's "Request for Judicial Notice/Notice of Lodging."

1991, Dow Corning submitted to the FDA a 25,000-page application for approval of its silicone breast implants. Dow Corning's application referenced hundreds of tests, including toxicological tests Dow Chemical had performed.

The Court of Appeal succinctly related the procedural history of this case. Starting in the early 1990's, many lawsuits were filed against the manufacturers of silicone breast implants, including Dow Corning. Some of these lawsuits also named as defendants Dow Chemical and Corning. Dow Corning is now in bankruptcy.

Silicone breast implant actions filed in federal courts were consolidated in a multidistrict action in the Northern District of Alabama. (*In re Silicone Gel Breast Implants Products Liability Litigation* (N.D.Ala. 1993) 837 F.Supp. 1128.) The federal district court initially dismissed claims against Dow Chemical and Corning, but subsequently reinstated claims against Dow Chemical. (*In re Silicone Gel Breast Implants Products Liability Litigation* (N.D.Ala. 1995) 887 F.Supp. 1455, 1460-1461.)

In December 1992, silicone breast implant cases filed in California state courts were coordinated in this proceeding. Following coordination, plaintiffs Eda Artiglio and others adopted a master complaint that pleaded a number of causes of action, including strict liability, negligence, breach of warranty, deceit and infliction of emotional distress. Dow Chemical and Corning adopted a master answer. In late 1993, the trial court approved a master set of interrogatories to the defendants and also a master document request. Dow Chemical and Corning filed timely responses to these requests. The first of the coordinated cases was set for trial in the spring of 1994. In February 1994, Dow Chemical and Corning filed their respective motions for summary judgment; plaintiffs requested further discovery.

The trial court granted Dow Chemical's and Corning's motions for summary judgment, concluding the undisputed facts established as a matter of law that neither Dow Chemical nor Corning owed a duty of care to plaintiffs. The trial court also denied plaintiffs' request for additional discovery in light of the extensive discovery conducted both in California and nationwide over the last two years in conjunction with breast implant litigation. The trial court entered judgment in favor of Dow Chemical and Corning, and plaintiffs appealed. The Court of Appeal affirmed.

We granted plaintiffs' petition for review.

*Discussion*

### 1. *Standard of review*

■ Dow Chemical's motion for summary judgment was properly granted "if all the papers submitted show that there is no triable issue as to any material fact and that [Dow Chemical] is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) We review the trial court's decision de novo, considering "all of the evidence set forth in the [supporting and opposition] papers, except that to which objections have been made and sustained by the court, and all [uncontradicted] inferences reasonably deducible from the evidence." (*Ibid.*) " 'To succeed, [Dow Chemical] must . . . demonstrate that under no hypothesis is there a material issue of fact that requires the process of a trial.' " (*Flatt* v. *Superior Court* (1994) 9 Cal.4th 275, 279 [36 Cal.Rptr.2d 537, 885 P.2d 950], quoting *Molko* v. *Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1107 [252 Cal.Rptr. 122, 762 P.2d 46]; see also *Engalla* v. *Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 973, fn. 7 [64 Cal.Rptr.2d 843, 938 P.2d 903]; *Flowers* v. *Torrance Memorial Hospital Medical Center* (1994) 8 Cal.4th 992, 1000 [35 Cal.Rptr.2d 685, 884 P.2d 142].)

### 2. *The decisions below*

The trial court granted Dow Chemical's motion for summary judgment on the ground that "as a matter of law defendants owed no duty to plaintiffs in this coordinated action, either directly or under section 324A of the Restatement (Second) of Torts."

The Court of Appeal affirmed, concluding no triable issue of fact remained as to whether Dow Chemical had made a "manifestation of responsibility to third parties" sufficient to give rise to a duty of care to plaintiffs. As will appear, we agree with the Court of Appeal's conclusion. We begin by briefly reviewing existing California negligent undertaking jurisprudence and the elements of such a claim.

### 3. *Section 324A*

The common law theory restated in section 324A is one of liability to third persons for physical harm caused when, under certain listed circumstances, one negligently performs an undertaking to another. In its entirety, section 324A reads: "One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third

person for physical harm resulting from his failure to exercise reasonable care to [perform][4] his undertaking, if [¶] (a) his failure to exercise reasonable care increases the risk of such harm, or [¶] (b) he has undertaken to perform a duty owed by the other to the third person, or [¶] (c) the harm is suffered because of reliance of the other or the third person upon the undertaking."

Over 30 years ago, we described this negligent undertaking theory of liability—sometimes referred to as the "Good Samaritan" rule—as "[f]irmly rooted in the common law [of negligence]" (*Schwartz* v. *Helms Bakery Limited* (1967) 67 Cal.2d 232, 238 [60 Cal.Rptr. 510, 430 P.2d 68]) and cited section 324A as one of the authorities establishing its controlling principles (67 Cal.2d at p. 238, citing numerous authorities). Indeed, "[i]t is ancient learning that one who assumes to act, even though gratuitously, may thereby become subject to a duty of acting carefully, if he acts at all." (*Glanzer* v. *Shepard* (1922) 233 N.Y. 236 [135 N.E. 275, 276, 23 A.L.R. 1425].) As "Dean Prosser says [and Dow Chemical concedes], '[I]f the defendant enters upon an affirmative course of conduct affecting the interests of another, he is regarded as assuming a duty to act, and will thereafter be liable for negligent acts or omissions[.]' " (*Valdez* v. *Taylor Automobile Co.* (1954) 129 Cal.App.2d 810, 817 [278 P.2d 91].)

Thus, it is settled law that one "who, having no initial duty to do so, undertakes to come to the aid of another—the 'good Samaritan' "—has "a duty to exercise due care in performance and is liable if (a) his failure to exercise care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking." (*Williams* v. *State of California* (1983) 34 Cal.3d 18, 23 [192 Cal.Rptr. 233, 664 P.2d 137], citing Rest.2d Torts, § 323; see, e.g., *Coffee* v. *McDonnell-Douglas Corp.* (1972) 8 Cal.3d 551, 557 [105 Cal.Rptr. 358, 503 P.2d 1366] [same]; see also BAJI No. 4.45 ["A person who is under no duty to care for or render service to another but who voluntarily assumes such a duty, is liable to the other for injury caused by a failure to exercise ordinary or reasonable care in the performance of that assumed duty."].)[5]

As the traditional theory is articulated in the Restatement, a negligent undertaking claim of liability to third parties requires evidence that: (1) the

---

[4]The published text of section 324A uses "protect" rather than "perform." Such was apparently a typographical error. (*Heinrich* v. *Goodyear Tire and Rubber Co.* (D.Md. 1982) 532 F.Supp. 1348, 1351, fn. 5, citing *Hill* v. *United States Fidelity and Guaranty Company* (5th Cir. 1970) 428 F.2d 112, 115, fn. 5.)

[5]Statutory exceptions to Good Samaritan liability include immunities under certain, primarily emergent, circumstances for medical licensees (Bus. & Prof. Code, §§ 2395-2398), nurses (Bus. & Prof. Code, §§ 2727.5, 2861.5), dentists (Bus. & Prof. Code, § 1627.5), rescue teams (Health & Saf. Code, § 1317), paramedics (Health & Saf. Code, § 1799.104), those acting to remove food from the throat of a person choking (Health & Saf. Code, § 114180) and

actor (in this case, Dow Chemical) undertook, gratuitously or for consideration, to render services to another (Dow Corning); (2) the services rendered were of a kind the actor should have recognized as necessary for the protection of third persons (plaintiffs); (3) the actor failed to exercise reasonable care in the performance of its undertaking; (4) the failure to exercise reasonable care resulted in physical harm to the third persons; and (5) either (a) the actor's carelessness increased the risk of such harm, or (b) the undertaking was to perform a duty owed by the other to the third persons, or (c) the harm was suffered because of the reliance of the other or the third persons upon the undertaking. (See generally, *FNS Mortgage Service Corp.* v. *Pacific General Group, Inc.* (1994) 24 Cal.App.4th 1564, 1572 [29 Cal.Rptr.2d 916]; *Williams* v. *Saga Enterprises, Inc.* (1990) 225 Cal.App.3d 142, 151 [274 Cal.Rptr. 901]; see also *Roberson* v. *United States* (9th Cir. 1962) 382 F.2d 714, 721.) Recovery on section 324A's negligent undertaking theory thus requires proof of each of the well-known elements of any negligence cause of action, viz., duty, breach of duty, proximate cause and damages. (See generally, *Schwartz* v. *Helms Bakery Limited, supra,* 67 Cal.2d at p. 238 [applying, inter alia, § 324A to ascertain duty element in negligence action]; 6 Witkin, Summary of Cal. Law, *supra,* Torts, § 732, pp. 60-62 [elements of negligence action]; Rest.2d Torts, § 281 [same].)

4. *Duty*

■ "The threshold element of a cause of action for negligence is the existence of a duty to use due care toward an interest of another that enjoys legal protection against unintentional invasion. [Citations.] Whether this essential prerequisite to a negligence cause of action has been satisfied in a particular case is a question of law to be resolved by the court." (*Bily* v. *Arthur Young & Co.* (1992) 3 Cal.4th 370, 397 [11 Cal.Rptr.2d 51, 834 P.2d 745, 48 A.L.R.5th 835], citing Rest.2d Torts, § 281, subd. (a); 6 Witkin, Summary of Cal. Law, *supra,* Torts, §§ 732, 748, pp. 60, 83.) ■ Plaintiffs contend Dow Chemical owed them a duty of care in the conduct and reporting of its silicone toxicology research for Dow Corning.

Plaintiffs' claim, as indicated, is grounded in the theory of "Good Samaritan" or negligent undertaking liability articulated in section 324A. ■ "The foundational requirement of the good Samaritan rule is that in order for liability to be imposed upon the actor, he must specifically have undertaken to perform the task that he is charged with having performed negligently, for without the actual assumption of the undertaking there can be no correlative

first aid volunteers (Gov. Code, § 50086). None of these statutory exceptions apply to our inquiry. (See generally, 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, §§ 279, 281, pp. 361, 364.)

duty to perform that undertaking carefully." (*Blessing* v. *United States* (E.D.Pa. 1978) 447 F.Supp. 1160, 1188-1189.)

As noted, whether Dow Chemical's alleged actions, if proven, would constitute an "undertaking" sufficient, within the meaning of section 324A's negligent undertaking theory, to give rise to an actionable duty of care is a legal question for the court. In some cases, however, as Dow Chemical acknowledges, there may be fact questions "about precisely what it was that the defendant undertook to do." That is, while "[t]he 'precise nature and extent' of [an alleged section 324A] duty 'is a question of law . . . 'it depends on the nature and extent of the act undertaken, a question of fact.' " (*Smith* v. *State* (Alaska 1996) 921 P.2d 632, 634 [921 P.2d 632], citation omitted.) Thus, if the record can support competing inferences (*ibid.*), or if the facts are not yet sufficiently developed (*Mays* v. *Liberty Mutual Insurance Company* (3d Cir. 1963) 323 F.2d 174, 175-176), " 'an ultimate finding on the existence' of a duty cannot be made prior to a hearing on the merits' " (*id.* at p. 176), and summary judgment is precluded. (Accord, *Pratt* v. *Liberty Mut. Ins. Co.* (2d Cir. 1992) 952 F.2d 667, 670; *Blessing* v. *United States, supra,* 447 F.Supp. at pp. 1188-1189; *Santillo* v. *Chambersburg Engineering Co.* (E.D.Pa. 1985) 603 F.Supp. 211, 214; *Hodge* v. *U.S. Fidelity and Guar. Co.* (Ala. 1989) 539 So.2d 229, 230-231.)

In this case, the record establishes that Dow Chemical undertook to conduct and report the items of silicone toxicology research listed by the Court of Appeal. Obviously, toxicology research for a medical manufacturer, by its nature, at least theoretically implicates the well-being and protection of third parties; that is, to undertake such research broadly implicates the well-being and protection of potential patients who ultimately may receive treatment developed on its basis. (Cf. *Santillo* v. *Chambersburg Engineering Co., supra,* 603 F.Supp. at p. 214 [defendant provided safety inspections of an employer's physical plant; court noted "[s]afety concerns, by their nature involve consideration of the well-being and protection of third parties: the employees"].) Nevertheless, "[t]he duty of a 'good Samaritan' is limited. Once he has performed his voluntary act he is not required to continue to render aid indefinitely." (*Baker* v. *City of Los Angeles* (1986) 188 Cal.App.3d 902, 907 [233 Cal.Rptr. 760] [policeman who took gun from intoxicated husband "did not become a guarantor of [wife's] future safety"]; see also *Andrews* v. *Wells* (1988) 204 Cal.App.3d 533, 541 [251 Cal.Rptr. 344] [bartender who twice arranged ride for intoxicated patron had no continuing duty to make such arrangements].) Thus, "a Good Samaritan who has performed a series of voluntary acts in the past is not thereafter required indefinitely to continue performing such acts into the future." (*City of Santee* v. *County of San Diego* (1989) 211 Cal.App.3d 1006, 1012 [259 Cal.Rptr.

757] [county sheriff's past reporting of traffic light outages gave rise to no continuing duty to make such reports].)

Our de novo review of the record (Code Civ. Proc., § 437c, subd. (c)) in light of these principles reveals that no triable issue of fact concerning the scope of Dow Chemical's undertaking to Dow Corning remains to foreclose resolution of this matter on summary judgment.

Dow Chemical scientists Rowe, Spencer and Bass published the 1948 article summarizing toxicological research on various silicones and stating that, as a group, silicones have a very low order of toxicity. Dow Chemical and Dow Corning jointly commissioned the 1957 Saranac Lake Laboratories study of Dow Corning's silica dust, concluding high levels of the dust severely damaged test rats' breathing apparatus. Dow Chemical's M. B. Chenoweth assisted with Dow Corning's 1956 study on migration of silicone compounds in mammals that found a silicone compound, later used in breast implants, migrated when administered orally to dogs and when injected intramuscularly in a rat. Also in 1956, Dow Corning commissioned Dow Chemical to study the effect of silicone fluids when injected intravenously. Dow Chemical and Dow Corning cooperated with and funded the 1957 University of Miami silicone toxicology research, the reporting of which plaintiffs allege was inadequate. Dow Chemical also performed the 1959 study for Dow Corning demonstrating that silicones may cause eye irritation.

Thus, as plaintiffs acknowledge in their briefs before this court, the late 1940's and the decade of the 1950's were the "critical years" in which Dow Chemical undertook silicone toxicology research contributing to Dow Corning's development of silicones for medical applications. The public representations concerning appropriateness of silicones for medical use that plaintiffs find objectionable were principally made by Dow Chemical, in medical bulletins and an annual report, in the 1950's as well.[6] The record reflects, however, that the first silicone breast implant operation did not occur until 1962, in clinical trials.

In 1964, Dow Corning established its own medical products division to market breast implants and other medical devices using silicone technology. It was not until 1991 that Dow Corning was required to submit to the FDA an application for approval of its silicone breast implants. Plaintiffs acknowledge that, in the 1970's and 1980's, Dow Corning conducted silicone

---

[6]Plaintiffs point also to a 1992 trade magazine article quoting Dow Chemical's president and chief executive officer as finding Dow Corning's silicone breast implants "beyond reproach," but concede the speaker was a member of Dow Corning's board of directors.

toxicity testing in its own facilities. As mentioned, plaintiffs also acknowledge Dow Chemical has never made or sold any silicone gel breast implants.[7] Although plaintiffs assert Dow Corning continued occasionally to rely on Dow Chemical researchers and facilities, the record, as the Court of Appeal noted, establishes that, after 1964, Dow Corning's medical products division employed its own staff of scientists; Dow Chemical and Corning, moreover, conducted no tests with respect to the safety of the actual breast implants Dow Corning marketed.

Plaintiffs contend the evidence that Dow Chemical formally lent Dow Corning its tradenames and goodwill (retaining inspection rights) in 1975 agreements raises a triable issue of fact as to whether Dow Chemical undertook Good Samaritan liability toward them. (Cf. *Hanberry* v. *Hearst Corp.* (1969) 276 Cal.App.2d 680, 684-685 [81 Cal.Rptr. 519, 39 A.L.R.3d 173] [public policy imposed duty on publisher to use ordinary care in issuance of its seal and certification of quality so that consumers who relied thereon would not be unreasonably exposed to risk of harm].) Dow Chemical insists the agreements conferred no right or practical ability on Dow Chemical to control Dow Corning's application of Dow Chemical's research.

While the trademark and tradename agreements may have conferred upon Dow Chemical certain inspection rights, there is no suggestion the agreements imposed a duty to perform tests, let alone that they constituted a general undertaking by Dow Chemical to guarantee the safety of Dow Corning's silicone product lines. In considering a parallel claim based on much of the same evidence, the Eighth Circuit Court of Appeals concluded the trademark agreements "contain[] no evidence to show that Dow Chemical undertook to render services to Dow Corning" (*Temporomandibular Joint (TMJ) Implants* (8th Cir. 1997) 113 F.3d 1484, 1494) and found "no evidence that Dow Chemical in fact inspected any Dow Corning product or provided any services to Dow Corning pursuant to these agreements" (*ibid.*) such as could give rise to a tort duty on the theory articulated in section 324A. Our review of the record yields the same result.

In sum, the record before the trial court on summary judgment would not support a finding that Dow Chemical's was "an undertaking of such breadth and magnitude as to create a duty on the part of Dow Chemical to ensure the safety of all of Dow Corning's silicone products." (*Temporomandibular Joint (TMJ) Implants, supra,* 113 F.3d at p. 1495.) Moreover, many years elapsed between Dow Chemical's seminal toxicology research activities on behalf of Dow Corning and plaintiffs' alleged injuries. When

---

[7]But see footnote 3, *ante,* discussing plaintiffs' citation of asserted "new evidence" to the contrary.

that research was done, any possible consequence for plaintiffs—who years later allegedly received medical treatments traceable to its influence—was exceedingly attenuated and remote. We conclude that, at the times Dow Chemical allegedly conducted or reported for Dow Corning the toxicology research services on which plaintiffs premise their section 324A claim, it cannot reasonably be concluded that Dow Chemical "should [have] recognize[d]" those services were "necessary for the protection of" (§ 324A) plaintiffs. Accordingly, under the theory articulated in section 324A, no duty of care running to plaintiffs arose from Dow Chemical's undertaking.

It follows that plaintiffs cannot establish the duty element of their section 324A cause of action against Dow Chemical, and that the trial court's grant of summary judgment for Dow Chemical therefore was correct (Code Civ. Proc., § 437c, subd. (o)(2); *D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1, 18 [112 Cal.Rptr. 786, 520 P.2d 10]). Accordingly, we need not address the other elements of plaintiffs' section 324A claim.

*Disposition*

For the foregoing reasons, the judgment of the Court of Appeal is affirmed.

George, C. J., Kennard, J., Baxter, J. Brown, J., and Callahan, J.,* concurred.

**MOSK, J.**—I dissent.

In this coordinated proceeding, as pertinent here, plaintiffs including Eda Artiglio seek damages in the superior court based on a claim of negligence against defendants including the Dow Chemical Company, Corning Incorporated, and Dow Corning Corporation.

By way of background: Dow Chemical and Corning formed Dow Corning in 1943 to develop and produce silicones, and have owned it in equal shares ever since. Dow Chemical undertook to perform human toxicological research on silicones for biomedical applications on behalf of Dow Corning in 1948, and continued to do so until at least 1959. Dow Chemical's facilities were located adjacent to those of Dow Corning. Dow Corning designed, manufactured, and sold silicone breast implants in the period from 1961 to 1992. Plaintiffs were recipients of these or similar products, and allegedly suffered injury including physical harm as a result. Dow Corning filed a

---

*Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

voluntary petition for reorganization under chapter 11 of the Bankruptcy Code in 1995, and has since enjoyed the benefit of an automatic stay of the commencement or continuation of all actions or proceedings, including this one.

On separate motions by Dow Chemical and Corning, which were opposed by plaintiffs, the superior court granted summary judgment in favor of the former and against the latter, concluding, as a matter of law, that neither Dow Chemical nor Corning owed any duty to plaintiffs. It caused entry of judgment of dismissal, expressly as to Corning, impliedly as to Dow Chemical.

On appeal, the Court of Appeal affirmed. It concluded, as a matter of law, that neither Dow Chemical nor Corning owed any duty to plaintiffs.

On review, which involves Dow Chemical but not Corning, the majority affirm in turn. They conclude, as a matter of law, that Dow Chemical did not owe any duty to plaintiffs.

I would reverse. Unlike my colleagues, I believe that there is at least a triable issue of material fact on the question.

Under the law of negligence of California, Civil Code section 1714, subdivision (a), declares the general principle that "[e]very one is responsible . . . for an[y] injury occasioned to another by his want of ordinary care or skill in the management of his property or person . . . ." As to actors, it covers, in terms, "every one"—which embraces all those who perform human toxicological research on substances for biomedical applications, including entities such as Dow Chemical with regard to silicones on Dow Corning's behalf. As to victims, it covers, by implication, the general class of persons for whose protection the actor in question is required to exercise the demanded care or skill (see *Richards* v. *Stanley* (1954) 43 Cal.2d 60, 63 [271 P.2d 23]; see also *Hosking* v. *San Pedro Marine, Inc.* (1979) 98 Cal.App.3d 98, 106 [159 Cal.Rptr. 369] (conc. opn. of Hanson, J.) [reading *Richards* in light of Civ. Code, § 1714, subd. (a)])—which embraces all those who are subsequently exposed to any such substances, including plaintiffs who were recipients of Dow Corning silicone breast implants.

Restatement Second of Torts section 324A, which reflects California's law of negligence, declares a more specific principle, to the effect that "[o]ne who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical

harm resulting from his failure to exercise reasonable care to protect [*sic*: read, apparently, perform] his undertaking, if" "(a) his failure to exercise reasonable care increases the risk of such harm," or "(b) he has undertaken to perform a duty owed by the other to the third person," or "(c) the harm is suffered because of reliance of the other or the third person upon the undertaking." As to actors, it covers, in terms, anyone "who undertakes . . . to render services to another which he should recognize as necessary for the protection of a third person or his things"—which embraces all those who perform human toxicological research on substances for biomedical applications, including entities such as Dow Chemical with regard to silicones on Dow Corning's behalf. As to victims, it covers, in terms, the general class of persons for whose "protection" the actor in question should recognize his "services" are "necessary"—which embraces all those who are subsequently exposed to any such substances, including plaintiffs who were recipients of Dow Corning silicone breast implants.

In *Rowland* v. *Christian* (1968) 69 Cal.2d 108, 112 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496], we stated: "Although it is true that some exceptions have been made to the general principle that a person is liable for injuries caused by his failure to exercise reasonable care in the circumstances, it is clear that in the absence of statutory provision declaring an exception to the fundamental principle enunciated by [Civil Code section 1714, subdivision (a)], no such exception should be made unless clearly supported by public policy." By parity of reasoning, the same is true of the more specific principle, which is set out in Restatement Second of Torts section 324A, that a person who undertakes to render services to another that he should recognize as necessary for the protection of a third person or his things may be subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to perform his undertaking.

Inasmuch as those who perform human toxicological research on substances for biomedical applications—including entities such as Dow Chemical with regard to silicones on Dow Corning's behalf—are not exempted by statutory law from the general principle of Civil Code section 1714, subdivision (a), or even from the more specific principle of Restatement Second of Torts section 324A, they should not be exempted from either one of them by decisional law, because such a result is not clearly supported by public policy. To be sure, any limitation of the "responsibility" or "liability" of such persons and entities under Civil Code section 1714, subdivision (a), or Restatement Second of Torts section 324A, respectively, might perhaps give an incentive to good work, through which many men and women could be helped. But it might also remove a deterrent against bad work, through

which many men and women could be hurt. Before a court could reasonably consider any such limitation, it would have to have available for its scrutiny an empirically based cost-benefit analysis. An analysis of this sort, however, is apparently nonexistent.

In concluding that Dow Chemical did not owe a duty to plaintiffs as a matter of law, the majority rely on an assertion that "any risk of physical harm to plaintiffs from" Dow Chemical's "negligent performance" of human toxicological research on silicones for biomedical applications on behalf of Dow Corning was "unforeseeable." (Maj. opn., *ante*, at p. 608.)

When we read the majority's assertion of the "unforeseeability" by Dow Chemical of "any risk of physical harm" to plaintiffs in the abstract, we find it to be without support. Indeed, reading it thus, we discover that it virtually deconstructs itself. (See maj. opn., *ante*, at pp. 608-610, 616.) To be brief: From 1948, Dow Chemical foresaw, or at least should have foreseen, a risk of physical harm. For in that year, V.K. Rowe, H.C. Spencer, and S.L. Bass published a seminal report. (Rowe and Spencer were employees of Dow Chemical, Bass of Dow Corning.) Although they concluded that "silicones as a group have a very low order of toxicity," they did not, and could not, conclude that they had none. At the very outset, they noted that silicones constituted an "unusual and radically different class of . . . substances." Among the potential hazards threatened by various silicones they listed irritation, inflammation, edema, necrosis, slowed growth, increase in weight of certain internal organs, respiratory failure, and death. From 1950, Dow Chemical foresaw, or at least should have foreseen, a risk of physical harm *to plaintiffs*. For in that year, R.R. De Nicola published a report on what was apparently the first silicone implant in a human being, specifically, an artificial urethra. In 1953, in response to a request for a silicone implant to serve as an artificial bile duct, Dow Corning "compounded" the first silicones "made specifically for medical use." And in 1955, J. Holter developed a silicone implant for use as a hydrocephalus shunt—a "significant breakthrough in medical science," which was widely publicized in the popular press as well as the scientific literature. That Dow Chemical acted without a focus on silicone *breast* implants does not negate the fact that it acted with a focus on *silicone implants*. Further, that it acted without awareness of plaintiffs as recipients of silicone *breast* implants does not negate the fact that it acted with awareness of the general class of persons to which plaintiffs belong, that is, recipients of *silicone implants*.

When we read the majority's assertion of the "unforeseeability" by Dow Chemical of "any risk of physical harm" to plaintiffs in its context, we find it to be of no consequence. For reading it thus, we discover that it goes to

proximate cause rather than duty. (See maj. opn., *ante*, at p. 617.) Proximate cause, of course, was not the basis of the superior court's granting of Dow Chemical's summary judgment motion, and hence was not the basis of the Court of Appeal's sustaining of that action. Even if it had been, it could not have survived scrutiny. For it is generally a question that is not amenable to determination on summary judgment. (See, e.g., *Bigbee* v. *Pacific Tel. & Tel. Co.* (1983) 34 Cal.3d 49, 56 [192 Cal.Rptr. 857, 665 P.2d 947].) It is not otherwise here.

In conclusion, because I believe that there is at least a triable issue of material fact whether Dow Chemical owed a duty to plaintiffs, I would reverse the judgment of the Court of Appeal and remand the cause to that court with directions to remand it in turn to the superior court for proceedings not inconsistent with the views that I have expressed herein.